```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   ---------------------------------x
 4   TOMASZ MIERZEJEWSKI,              :
 5              Plaintiff              :
 6   VS.                               :CIVIL ACTION NO:
 7   NATIONWIDE MUTUAL FIRE INSURANCE  :3:02CV752(SRU)
 8   COMPANY,                          :
 9              Defendant              :
10   ---------------------------------x
11                    APRIL 19, 2005
12                       VOLUME II
13         Continued deposition of TIMOTHY STEWART, taken
14   pursuant to the Federal Rules of Civil Procedure, held at
15   the New Britain Town Hall, 27 West Main Street, New
16   Britain, CT, before Elisa Ferraro, LSR, a Notary Public in
17   and for the State of Connecticut, License No. 233, on
18   Tuesday, April 19, 2005 at 10:28 a.m.
19
20
21              A+ REPORTING SERVICES
                    P.O. Box 831
22              Wallingford, CT 06492
                   (203)269-9976
23
24
```

1  Mr. Taalman's questions that this fire needed help to get
2  started. What did you mean by that comment?
3       MR. TAALMAN: Objection. Mischaracterizes
4    his testimony.
5  A    What I meant was as we eliminate potential
6  causes for fires, you eliminate to a point where the only
7  possible alternative would be incendiary nature which
8  would mean human hands. Somebody had to physically do
9  this because there were no other ignition sources within
10 that structure. It doesn't rule out who, what, when or
11 why. It suggests it could be somebody of human nature.
12 Q    Is it your opinion within a reasonable degree of
13 probability was this was an intentionally set fire. Is
14 that correct?
15      MR. TAALMAN: Objection. That's not what
16   he said. That's not in his report.
17      MR. FELDMAN: Mr. Taalman, I listened
18   through a day and a half of your questioning
19   and --
20      MR. TAALMAN: You're categorizing --
21      MR. FELDMAN: You're interrupting me, sir.
22   I'm quoting what he said. I'm allowed to ask
23   my questions and you're being obstructionist.
24   I'm going to seek sanctions. Could you let him

1    answer my question without interruption.
2         (Whereupon, the pertinent question was read back
3    by the court reporter.)
4    A    I would say yes, based on my experience.
5    Q    Mayor Stewart, you had indicated that it's
6    sometimes hard -- you also said something about a smoking
7    pigeon. You reasonably ruled that out?
8    A    It's an internal joke within our office. We had
9    a fire -- I'll give you a brief explanation. We had a
10   fire that was caused by a cigarette butt that had gotten
11   picked up by a pigeon on Winter Street a number of years
12   ago. There was debris in the gutter. A pigeon was on the
13   roof and dropped it and it started a fire. It's kind of
14   an internal joke within our department.
15   Q    It doesn't happen too often?
16   A    No, it doesn't. Our fire marshal made that call
17   a number of years ago.
18   Q    The determination of cause is based upon ruling
19   out other potential causes or at least as reasonable
20   alternatives, right?
21   A    Generally.
22   Q    You don't just take a cause that is unreasonable
23   or unfounded as an alternative potential cause, do you?
24   You only look at reasonable causes --

```
 1            MR. TAALMAN:  Objection to the form.
 2       Q    Withdrawn.  That's a terrible question.  You
 3  said I think that you have trouble stating -- Withdrawn.
 4            MS. POKORSKI:  Do we want to take a break now?
 5            (Whereupon, Off the record for a break at
 6       11:50 a.m.)
 7            (Whereupon, back on the record at 12:43 p.m.)
 8            (Whereupon, Documents were marked as Defendant's
 9       Exhibits 1 and 2 for identification.)
10       Q    (By Mr. Feldman.)  Good afternoon, Mayor
11  Stewart.
12       A    Again.
13       Q    Again.  I'm going to show you what I've marked
14  as Defendant's Exhibit 1.  Do you recognize Exhibit 1?
15       A    Yes.
16       Q    Is that a letter that you wrote to Nationwide
17  Insurance Company?
18       A    That's correct.
19       Q    Did you send that pursuant to a specific
20  statute?
21       A    It would be Connecticut General Statute 38a-318
22  which would be the arson statutes.
23       Q    Are you familiar with the state of Connecticut
24  arson statutes?
```

```
 1    A    That's correct.
 2    Q    Does that require insurance companies to share
 3  information with investigators from the fires?
 4    A    Yes.
 5    Q    It's your understanding that when you request
 6  information from insurance companies, they're required to
 7  give it to you?
 8    A    Yes.
 9    Q    Did they comply with your request, to your
10  knowledge?
11    A    Yes, they did.
12    Q    I'm going to show you Exhibit number 2.  I'm
13  going to ask if you could identify that document?
14    A    This is a NFIRS report which was compiled by the
15  deputy chief on duty.  He's required to do this as part of
16  normal response to any incident if he is the officer in
17  command.
18    Q    Who did prepare that?
19    A    This was prepared by Deputy Chief David Fiore.
20         MR. TAALMAN:  Off the record.
21         (Whereupon, off the record.)
22         (Whereupon, back on the record.)
23    Q    Several lines from the top it says "Ignition
24  factor."
```

1    A    Number 21, yes.

2    Q    What's 21 mean?

3    A    21 means suspicious, no civil disturbance which means it wasn't as a result of a large fight or something like that.

6    MR. FELDMAN: You did not mark Mayor Stewart's CV, did you?

8    MR. TAALMAN: No, I didn't. Mark it.

9    (Whereupon, CV was marked as Defendant's Exhibit 3 for identification.)

11    Q    Identify briefly what Exhibit 3 is.

12    A    This would be my curriculum vitae.

13    Q    How current is that?

14    A    Probably last month.

15    Q    Does it include all of your fire investigation training and experience?

17    A    In general, yes. But it doesn't get specific to the actual courses and continuing education classes that you had taken. It just says that I earned 180 CEUs toward my certification. It doesn't detail exact courses.

21    Q    Mayor Stewart, in the process of a cause and origin fire investigation, is one of the techniques to rule out viable causes?

24    A    Yes.

```
 1      Q    There are some things you can rule out
 2 conclusively?
 3      A    Yes.
 4      Q    And others you can reasonably rule out as being
 5 a viable cause, even if you can't completely eliminate it?
 6      A    Yes.
 7      Q    I'm showing you Plaintiff's Exhibit 6 and in
 8 particular the last two pages, it refers to that
 9 suspicious circumstance, patrolman's stop off at a
10 disturbance at 166 West Street?
11      A    Yes.
12      Q    The night of the fire?
13      A    Um, hum.
14      Q    Is that a yes?
15      A    Yes.
16      Q    Could you identify from looking at that who the
17 police officer was who prepared that report?
18      A    That would be Officer Cashman.
19      Q    He had been on West Street at what time?  Does
20 that indicate?
21      A    It says the time of report was 1:36 a.m.
22      Q    Does that indicate when he left 166 West Street?
23           MR. TAALMAN:  Objection to the form.
24           MS. POKORSKI:  You can answer.
```

1   A   No.

2   Q   Does it indicate whether he detected any fire,
3   smoke or the smell of fire while he was in the area of
4   West Street?

5       MR. TAALMAN:  Objection to the form.

6       MS. POKORSKI:  You can answer.

7   A   It does not.

8   Q   Does the report indicate that he had heard
9   fireworks while he was in that area?

10  A   It does not.

11      MR. TAALMAN:  Objection to form.

12  Q   I'm not referring to that any further.  There
13  was a fairly extensive investigation done of neighbors.
14  Is that correct?

15  A   Yes.

16  Q   Neighbors were canvassed about suspicious
17  circumstances and so forth.  Is that right?

18  A   Yes.

19  Q   Did anyone bring to your attention that people
20  had been awakened that night between midnight and three
21  o'clock a.m. on the night of the fire by fireworks?

22      MR. TAALMAN:  Objection to the form.

23  Q   To your recollection?

24  A   Not to my recollection.

1   Q   Do you recall anyone saying anything about, who
2   lived in the neighborhood, having heard fireworks on that
3   night between midnight and three o'clock a.m. the night of
4   the fire?
5   A   Not to my knowledge.
6   Q   Mayor Stewart, are you familiar with NFPA 921?
7   A   Yes.
8   Q   What is it?
9   A   Fire investigation bible basically.
10  Q   That's what you refer to when you need to look
11  up and rely on certain standards and techniques of
12  investigation?
13  A   Yes.
14  Q   Are you aware that NFPA 921 describes the
15  concept of competent ignition source?
16  A   Yes.
17  Q   Are you generally familiar with the concept of
18  competent ignition source?
19  A   You'd have to refresh my memory.  I haven't
20  looked in the book for a few years.
21  Q   I understand.  Have you ever been involved in
22  investigating fires, a fire or fires that were caused by
23  improperly discarded smoking material?
24  A   Yes.

```
 1      Q    How many such fires?
 2      A    I would say several over the years.  I would say
 3 well over -- at least a dozen.
 4      Q    It's a fairly frequent occurrence?
 5      A    Yes.
 6      Q    Do they follow a certain pattern?
 7      A    Generally, yes.
 8      Q    What is that pattern?
 9      A    It's usually buildings fit for human habitation
10 where people smoke in certain areas and they discard
11 cigarettes in a general pattern.  For instance, people are
12 not allowed to smoke in their houses so they go on the
13 back porch and they flick cigarettes in a certain area and
14 the wind would blow the cigarette back up underneath the
15 siding and start the back porch on fire.
16           Generally it would be improperly discarding of
17 their cigarette ashes.
18      Q    How about improperly discarded cigarettes or
19 cigars or matches?
20      A    Yes.
21      Q    Do those types of fires follow a typical time
22 line or pattern?
23      A    They're very slow moving fires for the most
24 part.  You can see where cigarettes would light -- I had a
```

```
 1  fire a couple years ago in front of a bank on South Main
 2  Street where someone was going into the bank, flicked
 3  their cigarette into the bushes and started the debris
 4  underneath the mulch and the mulch on fire and it started
 5  a slow burning fire.
 6       Q    Unlike the 83 West Street which was a very fast
 7  moving fire?
 8       A    Correct.
 9       Q    Is that one of the reasons you could reasonably
10  eliminate improperly discarded smoking materials as a
11  viable cause of this fire?
12            MR. TAALMAN:  Objection to the form.
13       A    Partially, yes.
14       Q    Were there other reasons?  No one lived there?
15       A    Yes.  That was primarily the reason.  There were
16  no inhabitants in the building at the time.  There were
17  people adjacent to the building at 85, however at 3:41
18  a.m. it's not very likely that there's going to be people
19  standing outside the building smoking cigarettes.  That's
20  just not normal behavior.
21       Q    So it's not normal behavior.  There didn't seem
22  to be the opportunity and it's inconsistent with what you
23  understand to be the time line with your view of smoking
24  material, fires being slow moving and smoldering fires?
```

```
 1            MR. TAALMAN:  Objection to the form.
 2       A    Something like that.  Smoldering fires are
 3  discarded or illegally -- careless smoking.  Lot of times
 4  things happen in the bedrooms.  That's a general
 5  occurrence for cigarette fires where people are smoking in
 6  bed and they catch their bed on fire.  That is generally a
 7  smoldering fire or even in a couch.  The cushions in a
 8  couch from a cigarette ash will smolder before they gain
 9  enough oxygen to be ignited.
10       Q    There was no furniture in the house, was there?
11       A    My understanding was no.  However, Mr.
12  Mierzejewski did indicate there was contents within the
13  building.
14       Q    Mostly in the basement?
15       A    I believe so.  Yes.
16       Q    What, if anything, was on the first -- let me
17  ask you this.  Was there any furniture, furnishings or
18  carpet in the first, second or third floors?
19       A    No, not to my knowledge.
20       Q    Did Mr. Mierzejewski tell you otherwise?
21       A    Besides an appliance, I believe he said there
22  was a dryer on the first floor and some tools and just
23  various tools for construction purposes.
24       Q    So would you find that because of that there was
```

1   an absence of a typical fuel load that would help foster a
2   discarded smoking material in a fire?
3            MR. TAALMAN:  Objection to the form of the
4       question.
5            MS. POKORSKI:  You can answer it.
6   A    Yes.
7   Q    Would the absence of typical furniture,
8   furnishings, rugs indicate the presence or the absence of
9   a typical fuel load in a residence?
10  A    A typical fuel load would be a furnished
11  building.  So the fact that this building was unfurnished
12  and unfinished would indicate a very light fuel load
13  within the structure; however, exposed studs and wood
14  throughout the structure can provide for a rapid spread of
15  fire.  There is no question.
16  Q    You had mentioned that there was styrofoam in
17  the basement according to Mr. Mierzejewski?
18  A    Yes.
19  Q    Is that correct?
20  A    Yes.
21  Q    And you found that the styrofoam remained intact
22  after the fire?
23           MR. TAALMAN:  Objection to the form of the
24      question.

```
 1        Q    Substantially intact?
 2        A    I believe there was some still unburned within
 3   the basement of the structure.
 4        Q    Is it your view that that did or didn't provide
 5   a fuel load for this fire?
 6             MR. TAALMAN:  Objection to the form of the
 7        question.
 8        Q    Or don't you know?
 9        A    I couldn't say definitively.  As you know
10   styrofoam as it burns becomes liquid fuel.
11        Q    Melts, right?
12        A    Melts rapidly and burns.  Given the fact that it
13   was in the basement and there were still some areas within
14   the basement that were unburned, it would not indicate
15   that the fire was in the basement.
16        Q    So the fact that some of the styrofoam remained
17   intact suggests it did not start in the basement.  Is that
18   correct?
19        A    Correct.
20        Q    Any evidence that anyone lived there?
21        A    No.
22        Q    It's your understanding that this was a vacant
23   unoccupied structure?
24        A    Yes.
```

64

```
 1      Q     Any evidence whatsoever to suggest a cooking
 2   fire?
 3            MR. TAALMAN:  Objection to the form.
 4            MS. POKORSKI:  You can answer.
 5      A     No.
 6      Q     Lightning or weather fire?
 7      A     No.
 8            MR. TAALMAN:  Objection to the form.
 9      Q     Electrical?
10      A     Almost impossible with no electrical source
11   within the building.
12      Q     So it would not be a viable --
13      A     Correct.
14      Q     -- cause?
15      A     Unless there was power in the building from
16   another source.
17      Q     That's speculative?
18      A     That's speculative, yes.
19      Q     Gas, propane or other utilities causing the
20   fire, any evidence of that?
21            MR. TAALMAN:  Objection to the form.
22      A     There were no utilities present within the
23   structure.
24      Q     You understood from Mr. Mierzejewski that the
```