UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TOMASZ MIERZEJEWSKI | ) | CIVIL ACTION NUMBER |
| | ) | |
| Plaintiff | ) | 3:02 CV 752 (SRU) |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONWIDE MUTUAL FIRE | ) | |
| INSURANCE COMPANY | ) | |
| | ) | |
| Defendants | ) | December 9, 2005 |

**AFFIDAVIT OF TOMASZ MIERZEJEWSKI**

1. I am over the age of 18 years.

2. I understand and believe in the obligations of an oath.

3. This affidavit is made on my personal knowledge.

4. On and prior to July 7, 2001, I was the owner of premises located at 83 West Street, New Britain, Connecticut.

5. I was in the process or renovating the three story, multi-family apartment building located on said premises, with the intent of residing there with my family and renting out the rest of the multi-family dwelling.

6. On the night of July7-8, 2001, the building at 83 West Street, New Britain, Connecticut, was totally destroyed by a fire of unknown origin.

7. In October, 2001, I submitted to Nationwide Mutual Fire Insurance Company a Sworn Statement in Proof of Loss, dated October 4, 2001 ("Proof of Loss"). See **Exhibit A,** attached.

8. I filled out the Proof of Loss on a form prepared by and given to me by Nationwide Mutual Fire Insurance Company.

9. The proof of loss was submitted to Nationwide Mutual Fire Insurance Company pursuant to Section I Conditions, subsection 2.(e), in accordance with the policy coverages and provisions.

10. No one from Nationwide explained to me the meaning of the terms used in Paragraphs 6, 7, 8 and 9 of the Proof of Loss, nor did anyone from Nationwide offer me any assistance in filling out the form or answering any questions I had.

11. The Form I was asked to fill out had two pages, numbered 2 of 3 and 3of 3, See Exhibit A, but I

don't recall ever getting the first page from Nationwide, nor do I have any idea of what it contained.

12. Paragraph 6 of the Proof of Loss asked for the "Actual Cash Value of said property at the time of the loss," and I indicated that the actual cash value of the building only at the time of the loss was $ 200,000, which I understood to mean the value of the building in dollars at the time of the loss.

13. Paragraph 7 of the Proof of Loss asked for "The Whole Loss and Damage," which I understood to mean the value of the building when fully and completely rebuilt, since the words "at the time of the loss" were *not* included in Paragraph 7 as they were in Paragraph 5 of the Proof of Loss.

14. I determined that "The Whole Loss and Damage" referred to in Paragraph 7, which I understood to mean the value of the building when fully and completely rebuilt, including furnishings and other personal property actually lost, would come to $269,173 for the building and $16,500 for the personal property actually lost in the fire. I attached the itemization of these totals to my Affidavit accompanying the Proof of Loss as Exhibits A and B.

15. I did not understand the phrase "Less Amount of Deductible or Coinsurance Penalty" as used in Paragraph 8 of the Proof of Loss and left it blank. I noted that Schedule "A" on the next page, which I believe had been prepared by my Nationwide agent and included an item entitled "Coinsurance, Average, Distribution or Deductible Clauses, if any" had also been left blank.

16. I understood the phrase "The Amount Claimed under the above numbered policy" in Paragraph 9 of the Proof of Loss to mean "Replacement Value", that is, the value of the building when fully and completely rebuilt together with the personal property lost, since I believed that Nationwide wanted to know the replacement cost of the entire finished building in order, in accordance with what I believed were the provisions of the Policy, to provide me with the insurance proceeds necessary to construct a finished building plus compensate me for my personal property losses.

17. In accordance with the acknowledgment at the bottom of the first page of the Proof of Loss ( numbered as page 2 of 3), I swore that I executed the Sworn Statement in Proof of Loss and that I voluntarily executed the same. The Statement made no mention that I was swearing to the truth and accuracy of the information contained therein.

18. The second page of the Sworn Statement in Proof of Loss (numbered as page 3 of 3) contained

Schedule "A" Policy Form, Schedule "B" Statement of Actual Cash Value and Loss Damage and Schedule "C" - Apportionment. See **Exhibit I**, p. 2

19. To the best of my knowledge and belief, Schedule A on the second page of the Proof of Loss had been filled out by Nationwide Mutual Fire Insurance Company or my Nationwide agent before I received it. I do not know from where the figures in Schedule A came or how they were derived. The space for "Coinsurance, Average, Distribution, or Deductible clauses, if any, had been left blank, just as I had left them blank on the first page of the Proof of Loss.

20. Item 1 in Schedule A gives a monetary value of $221,346 to the dwelling on the premises at 83 West Street, but I do not know whether that represents what Nationwide considered to be the coverage on the dwelling, its actual cash value at time of loss, or its total value as a completely finished building.

21. On the second page of the Proof of Loss Form, in Schedule "B," I again indicated that the Actual Cash Value of the Dwelling and Personal Property *at the time of the fire loss* was $200,000 for the building and $16,500 for the personal property, for a total cash value at the time of the loss of $216,500.

22. On the second page of the Proof of Loss Form, in Schedule "B," I again indicated that the "Loss and Damage," meaning the "Whole Loss and Damage" (see Proof of Loss p. 1) for the dwelling only, was the replacement value of a fully completed house, and that came to $269, 173. I did not include a personal property value in the "Loss and Damage" column, since I had already included it in the "Actual Cash Value" column and was unsure of whether the personal property value should appear more than once in this Schedule.

23. In addition to filling out the two page form entitled "Sworn Statement in Proof of Loss", I also executed a three (3) page Affidavit of eight (8) numbered paragraphs on October 19, 2001, the headings for each paragraph being established by Nationwide. See Exhibit I, together with attachments Exhibit "A" and Exhibit "B."

24. In Paragraph 5 of my Affidavit, I reference as Exhibit "A" the detailed "Estimate of a Three Family House With a Size: 44X28," which totaled $269,173. I noted on the Estimate that "THE <u>FINAL PRICE</u> MAY DIFFER BY ABOUT 10% FROM THE ABOVE ESTIMATE" (Emphasis added.) By

the "Final Price" I meant the final cost of the house when fully rebuilt and completed.

25. My intention in Paragraph 5 was to supply Nationwide with a detailed cost itemization of the replacement value of a fully completed three family house since I believed that was what Nationwide wanted me to do.

26. In the Estimate I provided an estimate totaling $269,173.00, for the full and complete reconstruction of the building. This total reflected a completed and rebuilt building, since I believed that the insurance company wanted to know the replacement cost of the entire building in order to provide me with insurance proceeds necessary <u>to construct a finished building</u>. See Exhibit I, attached Exhibit "A"

27. The "List of Property Loss" which I prepared, which is referenced in Paragraph 5 of the Affidavit and attached to the Affidavit as Exhibit "B," itemizes the personal property loss which has a total estimated value of the personal property items I actually lost in the fire, which estimate came to $16,500.00. See Exhibit I, attached Exhibit "B"

28. In Paragraph 7 of my Affidavit, I made no claim for fair rental value loss or living expenses, since the property at 87 West Street was being renovated and I was not living there. See Exhibit I

29. In paragraph nine (9) of my Affidavit, I also included with my Affidavit as Exhibit "C" the bill for demolition costs and removal of debris after the fire for $10,000.00, which I paid to Site Work, Inc., when Nationwide refused to pay same. Exh I, attached Exh "C"

30. Also included with my Affidavit as Exhibit "D" was a bill for $425.00, from Site Work, Inc. for fill to cover the area cleaned at the building site after the fire, which I also paid.

31. I also paid a bill in the amount of $875.00, for cut-off of water service to 83 West Street after the fire, which bill, marked paid, was attached to my Affidavit as Exhibit "E".

32. Nationwide received the Proof of Loss in October 2004, but none of its agents, servants and/or employees contacted me to let me know if they had any questions or comments regarding the Proof of Loss, nor did they require or seek any further substantiation of the contents of the Proof of Loss.

33. On November 1, 2001, the second day of my Examination Under Oath by Nationwide, the attorney for Nationwide first raised the issue of what I claimed to be "The Whole Loss and Damage" as set forth in Paragraph 7, and I learned for the first time that by that term, Nationwide meant the loss and damages to the building and its contents *at the time of the loss*, although the words "at the time of the loss" were not included in said Paragraph 7, but had been included in Paragraph 5.  Exhibit A, p. 2

34. At my Examination Under Oath ("EUO") on November 1, 2001, I made it clear to Nationwide that I did not intend to claim anything other than what I believed was due under the policy.

35. Until my EUO on November 1, 2001, I believed that my Policy provided for full replacement cost of a completed house in the event the original structure was completely destroyed by fire and that the "Whole Loss and Damage" in Paragraph 7 of the Proof of Loss sought to learn the replacement cost of the fully built structure.

36. Mr. Koziura, my Nationwide agent told me prior to the fire that a Nationwide appraiser had been to 83 West Street prior to the fire and had informed him that Nationwide's underwriters required me to increase insurance coverage on the house and to pay an additional premium..

37. Prior to the fire, I paid the premium on the increased insurance to the Nationwide agent, and the policy of insurance was in full force and effect on the night of July 7-8, when the premises were destroyed by fire.

38. After my EUO on November 1, 2001, having learned what Nationwide meant by the terms in the Proof of Loss forms, I prepared an Amended Sworn Statement in Proof of Loss ("Amended Proof of Loss") dated November 13, 2001, attached hereto as Exhibit B to reflect my new understanding that what Nationwide meant by the term "Whole Loss and Damage" was the loss and damage at the time of the fire and not the replacement cost of a completed building.

39. In the Amended Proof of Loss, the Whole Loss and Damage in Paragraph 7 was calculated at the time of the fire, and reflected the actual cash value of the building ($163,183, plus personal property loss ($16,500) and post-fire cleanup and cutoff costs ($11,300), which totaled $190,983.00 See Exhibit B.

40. I also prepared an Amended Affidavit, dated November 13, 2001, attached hereto as Exhibit II,

together with attachments listed as Exhibits "A," "B," "C," "D," and "E."

41. Attached to the Amended Affidavit was an amended Exhibit "A" entitled "Estimate of Fire Loss - Building," which included the value of the building at the time of the loss ($163,183) plus the cost of clean up of the house and debris removal ($ 10, 425) plus the cost of cutting off the water service ($875) for a total sum of $174,483.00.

42. The List of Property Loss attached to the Amended Affidavit as Exhibit "B" remained the same as in the original Proof of Loss, and totaled $16,500.00 Exhibit II, attached Exh "B"

43. Exhibits "C," "D,"and "E" attached to and referenced in the Amended Affidavit remained the same as those in the original Proof of Loss.

44. I did not make any intentional misrepresentation to Nationwide nor did I ever intend to deceive or mislead Nationwide as to my actual claims in the Sworn Statements regarding Proof of Loss, nor did I intend to provide a false statement regarding the amount of the loss.

45 I filled out the original Proof of Loss based on my best understanding of the terms that Nationwide used in its Proof of Loss Form, explicitly showing by itemizing the cost, that I understood that the term "Whole Loss and Damage" to mean the replacement cost of a fully completed house.

46. Nationwide and its agents, servants and employees never contacted me after submission of the Proof of Loss to inform me that my understanding of the terms in the Proof of Loss was erroneous or incorrect in any way.

47. I attempted to be as accurate and thorough as possible, given the ambiguity of the terms used in the Proof of Loss forms prepared by Nationwide, and my limited understanding of the English language.

48. Any inaccuracies or errors in the original Proof of Loss were at least partly due to the ambiguities and vagueness of the terms used by Nationwide in the Forms it provided me, which led to my good faith interpretation and misunderstanding their meaning.

49. Any inaccuracies or errors in the original Proof of Loss were also due to Nationwide's failure to provide any assistance in clarifying the information it sought and in failing to bring to my attention any such perceived inaccuracies or errors after Nationwide received my Proof of Loss.

51. I filled out the forms for Proof of Loss in good faith and attempted to provide financial loss

information in good faith as completely as possible and to the best of my knowledge and belief.

52. On January 29, 2001, I apparently signed what purports to be an Application for homeowner's insurance ("Application"). See Defendant's Exhibit 6, a copy of which is attached hereto as Exhibit III

53. This Application was on a form supplied by Nationwide was prepared by W. Vic Koziura, Connecticut agent for Nationwide at Mr. Koziura's office on January 29, 2001.

54. I did not prepare this Application; Mr. Koziura talked to me and then typed up the form for me to sign.

55. My recollection is that the Application (Defendant's Exhibit 6) was a longer form and it appears that Defendant's Exhibit 6 is incomplete in that it has been folded over above the signature line, thereby obliterating part of the Application. See Exhibit III, attached hereto.

56. When I came to Mr. Koziura for insurance on January 29, 2001, I explained to him that I had bought a three family house at 83 West Street, New Britain the previous year, which house had been vacant from the time I bought it, and which house I wanted to renovate in order to move in there with my family and then rent the other two units to tenants.

57. I told Mr. Koziura at our meeting of January 29, 2001, that I needed to have the house at 83 West Street insured so that I could obtain a construction line of credit and/or other financing to proceed with the renovation.

58. Mr. Koziura was, therefore, aware *before he prepared the Application* that (a) I did *not* live at 83 West Street, (b) that the house had been empty from the time I had bought it and (c) that *no one* was occupying the house at the time I came to him for the Application on January 29, 2001.

59. Mr. Koziura knew that I did not live at 83 West Street, because he was already my Nationwide agent for motor vehicle insurance, and knew that I lived at 100 Broad Street in New Britain with my family, because he sent my automobile insurance bills there.

60. In January, 2001 my family consisted of my wife Renata, my stepson Chris Bodziak and my three month old baby boy, Nicholas Mierzejewski, all of whom resided with me at 100 Broad Street, New Britain, Connecticut.

61. When he was preparing the Application, Mr. Koziura asked me if my wife and I *planned* to live at 83 West Street *after* the renovations, and I told him we did.

62. I do not know if Mr. Koziura was aware that we had two children who were living with us, but he did know, or should have known, that we resided at 100 Broad Street.

63. Mr. Koziura filled in the Application form and incorrectly stated therein that the premises at 83 West Street were owner occupied, and that the premises were currently occupied by two (2) occupants. The information was incorrect and I did not give the aforesaid incorrect information to Mr. Koziura.

64. To the best of my knowledge and belief, Mr. Koziura entered this information on his own volition, knowing or believing, as the agent for Nationwide Mutual Fire Insurance Company, that Nationwide would not provide homeowner's insurance on a house that was vacant and/or not owner occupied.

65. I do recall that when Mr. Koziura was filling out the Application form on January 29, 2001, he checked a book on how much insurance would be required for the house and entered the figure on the Application.

66. When I met with Mr. Koziura on January 29, 2001, no appraisal of the house had been made at that time.

67. After he finished filling out the Application, Mr. Koziura asked me to sign it, which I did, believing that he had correctly entered all the information I had verbally given him.

68. I was unable to read and fully understand the Application, since my language skills in English were very limited., and I trusted Mr. Koziura and believed the information that he entered on the Application was accurate and in conformity with what I had told him.

69. I was born in Poland and when I arrived in the United States in November, 1996, I spoke no English.

70. In 2001, having been in the United States a little over four (4) years, I had informally learned some English, but my language skills were still drastically limited in reading writing and understanding the English language.

71. Even today, it is still necessary for me to have documents translated and to have an interpreter present when I converse with my attorney.

72. An interpreter hired by Nationwide was used at my EUO at my counsel's insistence and over initial objection by Nationwide's counsel.

73. I did not mislead Nationwide nor did I misrepresent anything to Nationwide's agent who prepared the Application on his word processor or computer and then had me sign it.

74. Mr. Koziura did not translate the Application from English into Polish for me, nor did I have a translator present.

75. The information I gave to Mr. Koziura verbally was correct to the best of my knowledge and belief, and any incorrect information appearing on the Application was entered by Mr. Koziura on his own volition or as the result of mistake or misunderstanding.

76. I did not misrepresent any facts to Mr. Koziura nor did I intend in any way to deceive Nationwide in answering Mr. Koziura's questions when he prepared the Application dated January 29, 2001.

77. I made no material misrepresentations on my Proof of Loss or on my Amended Proof of Loss relating to the scope of the loss, but entered information on both documents in good faith based on my understanding of the nature of the information sought.

78. I did not seek to be paid for items that were not present in the house and, therefore, not damaged by the fire.

79. I did not enter any false material information regarding the occupancy of the building; any such information if it was entered on the Application, was entered by Mr. Koziura, Nationwide's agent without my knowledge or consent and in direct contradiction to information I gave him.

80. I am a general contractor and was at the time involved in the building industry, with considerable experience and expertise in understanding the costs of labor and materials, which experience, expertise and understanding I used in good faith in determining the values I provided for the Proof of Loss and the Amended Proof of Loss

81. Some time after he had prepared and asked me to sign the Application dated January 29, 2001, Mr. Koziura advised me that Nationwide had received the application and had sent out its

appraiser to evaluate the house.

82. According to Mr. Koziura, Nationwide had thereafter determined that the value of the house when fully completed would be considerably more than the figure of $162,200 that Mr. Koziura had entered on the original Application.

83. Mr. Koziura advised me that because of the higher evaluation given to the house when fully complete, the coverage on the policy would have to be increased and I would have to pay an additional amount of premium on the additional coverage, which payment I made prior to the fire that occurred on July 7-8, 2001.

84. To the best of my recollection, I made a payment to Nationwide on the Homeowner's Insurance in the amount of $ 912.70 by a check drawn on the Webster Bank dated June 27, 2001. See Exhibit C, attached.

85. Although the Proof of Loss dated October 4, 2001 was sent to Nationwide Mutual Fire Insurance Company in October, 2001, that Proof of Loss was not rejected by Nationwide until January, 2002.

Under the penalties of perjury, the foregoing is true and correct to the best of my knowledge and belief.

_____
TOMASZ MIERZEJEWSKI

Subscribed and sworn to before me
this 9th day of December, 2005

_____
Commissioner of the Superior Court
Notary Public
My Commission Expires: